SAVANNAH SUGAR REFINING CORPORATION v. MRS. LILLIAN L. SANDERS, W. RANSOM SANDERS, AND W. M. SANDERS, JR., EXECUTORS OF W. M. SANDERS, DECEASED.

(Filed 7 October, 1925.)

**1. Contracts—Breach—Bargain and Sale—Damages.**

Where a circular letter quoting the price of a commodity for future delivery is sent by a commission man of the seller to a customer, and later the customer writes that he has mislaid the circular letter and substantially states the quoted price and the terms of delivery, etc., asking if the offer was then in force, and being informed that it was, accordingly orders the goods, the minds of the parties come together upon an agreement binding upon both, and the principal, upon the purchaser's refusal of performance, may recover from him the damages he has thereby sustained.

**2. Same—Compromise and Settlement—Intent.**

Where there are two separate and distinct contracts of sale and purchase, and the purchaser sends his check in full payment of the balance due on the one, the acceptance of the check will not be regarded as a compromise and settlement of both contracts, and where the evidence is conflicting as to the intent of the parties, the question is for the jury.

APPEAL from *Bond, J.*, and a jury, April Term, 1925, of JOHNSTON.

This action was originally instituted against W. M. Sanders, who has since died, and the executors of his estate have been duly made parties defendant.

Plaintiff, through its broker, Lamborn & Co., of Savannah, Ga., claims that it sold W. M. Sanders 50 bbls. of granulated sugar at 22½c per pound, to be delivered in the fall of 1920 between 15 October and 30 November. This action is to recover $2,588.22 for damages for breach of contract.

The defendants denied the contract, set up fraud and also plead accord and satisfaction.

From Savannah, Ga., on 7 July, 1920, Lamborn & Co., who W. M. Sanders had been dealing with before, sent a circular letter to Sanders, in which was stated:

"To the Trade: Subject to confirmation we offer for the account of the Savannah Sugar Refinery their standard fine granulated sugar on the basis of 22.50 less 2% for cash f. o. b. Savannah Refinery, Port Wentworth, Ga., for shipment at seller's option between 15 October and 30 November, 1920. Usual refiner's terms will govern and sales will be covered by contracts signed by buyer and seller as a protection to each. . . . Then is set forth the market conditions and language calculated to induce the defendant and the trade to buy.

On these latter statements defendants set up false and fraudulent representations, etc. But this is not now material, as the issue of fraud

was found in favor of plaintiff, and there is no exception to the charge of the court below on this issue.

Then the circular states in what bulk the sugar can be shipped, but at the seller's option.

On 12 July, W. M. Sanders, writing from Smithfield, N. C., after mentioning a contract then being filled, heretofore made, says: "Is your circular letter of the 7th still in force? I seemed to have overlooked your circular or it came only yesterday." Lamborn & Co., on 15 July, 1920, answers the letter in regard to the contract then in existence—this was a 26c contract, 100 bbls.—and then writes: "Relative to our circular letter of 6 (7) July, we are pleased to advise you that this circular is still in force but unless you act quickly the possibilities are that we will not be able to confirm any of these sugars, therefore, we urge that if you are interested that you wire us immediately upon receipt of this letter giving us a definite order."

On 20 July, 1920, writing from Smithfield, N. C., in answer to Lamborn & Co.'s letter, W. M. Sanders says: "Yours of 15th. I have misplaced the circular letter of 6 (7) July, but it is my recollection that you proposed to make shipment during the fall months, and the price was around 22½ cents. If my memory is correct, you may bill me with 50 barrels."

There was a telegram, dated 2 August, 1920, which it was contended by defendants was never received, and plaintiff never proved by competent evidence that it was sent, viz.: "Bought fifty barrels fine granulated sugar basis twenty-two one-half less two per cent f. o. b. Savannah Refinery shipment sellers option between 15 October and 30 November." This telegram is immaterial from the view we take of the case. There are numerous letters on part of Lamborn & Co., holding Sanders to what they claim is the contract, and a contract sent Sanders for signature which was never signed although in the possession of Sanders; this contract is known as 423 and is in substance what is set forth in the circular letter, but in contract form between the parties.

On 23 August, 1920, W. M. Sanders wrote Lamborn & Co.: "Would you advise me to close out my contract sugar, in haste and with loss?" On 25 August, 1920, Lamborn & Co., answers and says: "It would be our suggestion that you meet reasonable competition. The situation is not in a very happy condition at the present. . . . On 27 August, 1920, W. M. Sanders writes Lamborn & Co.: "Yours of the 27th, also your telegram of the 26th. Our tobacco market opens here on the 7th. If the sugar should arrive before 15 September, I do not believe that it would be convenient for me to pay the draft. This refers to order 1254. Suppose you let the 34 barrels come out around 10 September. In re to contract No. 423, I have no record of having made such a purchase."

On 8 September, 1920, Lamborn & Co., writes Sanders in regard to contract 1254, and then says: "Relative to contract 423 that you mention in your letter of the 27th as having no record of being a party to, we wish to call your attention to the fact that this contract is between your good selves and the Savannah Sugar Refinery, being your purchase of 50 bbls. at 22½c per pound, less 2% for cash f. o. b. Savannah Refinery—for shipment during October-November. Your definite order for these sugars was received in your letter of 20 July."

On 11 September, 1920, Sanders writes to Lamborn & Co., about 1254 contract and says: "In regard to sale 423, I have no record of having made such a purchase, neither did you submit a contract until 11 August. In the meantime I had made another purchase of sugar. I am sorry but I cannot absorb that lot."

Then, on 27 September, 1920, Lamborn & Co., writes Sanders: referring to letter of 20 July, etc. Then on 29 September, 1920, Sanders writes Lamborn & Co., as follows: "I have your letter and telegram of yesterday. I cannot possibly absorb any more sugar now. The conditions here are distressing and I could not pay for the sugar if ordered."

On 8 October, 1920, Sanders writes Lamborn & Co.: "Yours of the 6th. I will send check for shipment in next few days. Please make no further shipments. The decline in prices of cotton and tobacco has hit this section hard. I think everyone should be willing to share in the heavy losses."

The other letters we do not think material. After notice to Sanders, the sugar was sold at a loss of $2,588.22, as of 23 December, 1920.

The defendants, to substantiate the plea of accord and satisfaction, introduced in evidence the following check:

"Smithfield, N. C., 16 Dec., 1920.

"Pay to the order of

| | |
|---|---|
| Savannah Sugar Refinery Co. | $774.48 |
| Seven Hundred and Seventy-four and...........................48/100 Dollars. | |

For a/c and contracts in full to date.

W. M. SANDERS.

"To the Citizens National Bank,
    Smithfield, N. C."

The check was duly endorsed by the treasurer of the Savannah Sugar Refining Corporation and was paid. The entire record evidence shows that W. M. Sanders owed Lamborn & Co. on contract 1254, the balance being the exact amount of the check sent.

It was in evidence, on the part of the plaintiff: "That in the summer of 1920, Lamborn & Co., had a toll contract with the Savannah Sugar Refining Corporation, by which the Savannah Sugar Refining Corpora-

tion got a toll on all raw sugars. That Lamborn & Co. sold 100 barrels of sugar to W. M. Sanders at Smithfield, and as the sugar was shipped out, it was delivered by the Savannah Sugar Refining Corporation, because on the toll contract, it was understood and agreed that the Savannah Sugar Refining Corporation would use its facilities for collecting for shipments which it made for Lamborn & Co. A rubber stamp was put on each invoice which Mr. Sanders got and on each invoice which he received it was stated: "Please make your remittances to the Savannah Sugar Refinery." Therefore, he would make the check payable to the Savannah Sugar Refining Corporation instead of Lamborn & Co. The invoice showed the number of the contract that the sugar was intended to cover. Sugar shipped under contract No. 1254 would be stamped on that contract No. 1254, so that the purchaser knew exactly what he was paying for when he remitted."

The issues submitted to the jury and their answers thereto, were as follows:

"1. Did the plaintiff agree to sell to defendant, and did defendant agree to buy of plaintiff, fifty (50) barrels of fine granulated sugar, at the price of twenty-two and one-half (22½) cents per pound, less 2% on board cars at the Savannah Refinery, Port Wentworth, Ga., shipment to be made between 15 October, 1920, and 30 November, 1920, at the option of plaintiff, as alleged in the complaint? Answer: Yes.

2. Was the contract of sale, if made, induced by fraudulent representations of the plaintiff, as alleged by the defendant? Answer: No.

3. Did the defendant wrongfully refuse to accept and pay for the sugar, as he had contracted and agreed to do? Answer: Yes.

4. Has there been a settlement between plaintiff and defendant, as alleged in the answer? Answer: No.

5. In what amount is defendant indebted to the plaintiff? Answer: $2,588.22, with interest from 23 December, 1920."

Judgment was rendered on the verdict. Exception and assignment of error were made and appeal to Supreme Court. Defendants made numerous exceptions and assignments of error to the admission of testimony and charge of the court. The refusal of the court to allow the defendants a judgment as of nonsuit at the close of plaintiff's evidence and at the close of all the evidence.

The entire charge is not set forth in the record. The necessary extracts will be set forth in the opinion.

*Connor & Hill; Hitch, Denmark & Lovett of Savannah, Ga., for plaintiff.*

*Parker & Martin, and Murray Allen, for defendants.*

CLARKSON, J.  From a careful examination of the entire record we do not see any difficulty in determining that plaintiff and defendant, W. M. Sanders, came to an understanding and agreement. The circular letter from Lamborn & Co., of 7 July, 1920—"We offer for the account of the Savannah Sugar Refinery their standard fine granulated sugar on the basis of 22.50 less 2% for cash." . . . .    W. M. Sanders' letter of 12 July: "Is your circular letter of the 7th still in force?" Lamborn & Co.'s letter of 15 July: "Circular letter of 6 July (7th) . . . . is still in force."  W. M. Sanders' letter of 20 July: "The price was around 22½ cents if my memory is correct, you may bill me with 50 bbls."

In *Overall Co. v. Holmes,* 186 N. C., p. 431, this definition of contract is given: "A contract is an 'agreement, upon sufficient consideration, to do or not to do a particular thing.'  2 Blackstone Com. p. 442. There is no contract unless the parties assent to the same thing in the same sense.  A contract is the agreement of two minds—the coming together of two minds on a thing done or to be done.  'A contract, express or implied, executed or executory, results from the concurrence of the minds of two or more persons, and its legal consequences are not dependent upon the impressions or understandings of one alone of the parties to it. It is not what either thinks, but what both agree,'" citing numerous authorities.

In the briefs of defendants, great stress is laid on two propositions: (1) That the telegram of 2 August, 1920, was improperly admitted in evidence and that the telegram was the acceptance of a proposition and being a part of the contract relied on was not properly proved.  As stated, we think the contract was binding on the parties from the letter of 20 July.  The offer was made and accepted: "You may bill me with 50 bbls."  Plaintiff from the letter of 20 July, was bound to Sanders and the telegram of 2 August, 1920, did not affect the contract. It was immaterial and not prejudicial and this interesting contention need not now be considered.  (2) Conceding that the telegram was properly admitted in evidence and it was an acceptance, plaintiff having waited some 11 days, allowing time for transmission, in this kind of commercial transaction the delay was unreasonable.  Defendants in their brief say: "Thus for the period of eleven days before the date of the telegram and twenty-two days before receipt of the formal contract, the defendant, Sanders, was 'hog-tied,' and Lamborn and Company 'footloose.'"  Whatever may be the merit of defendant's legal contention as to reasonable time, the principle does not apply here.  The telegram was not a part of the contract—it was corroborative of it, both were "contract-tied."  The contract was concluded by the letter of 20 July. It was so considered by plaintiff, who frequently wrote defendant to

that effect, and the denials of Sanders were negative. In fact, Sanders was careful in his letters, it seems, not to make any positive denial.

The question of what is "reasonable time" is not germane here. What is reasonable time in commercial matters of this kind is ably discussed by *Varser, J.,* in *Colt & Co. v. Kimball, ante,* 169.

We do not think the check sent, on which was written "For a/c and contracts in full to date," was accord and satisfaction on this contract— No. 423. The court below charged the jury, in part, as follows, on this aspect: "If a man be indebted to another, on account, and because of two or more separate and distinct contracts and statement is sent him by the other showing a balance due by him on one of the contracts, and nothing is said or shown in the statement or in the letter accompanying it, as to and in regard to any amount due on the other contract, the sending of a check which has written in the face of it, 'In full of account to date,' or similar language, for the amount shown to be due by the statement, will only be a payment of the amount shown to to be due by the statement, and its acceptance will not operate as a discharge or payment of any amount which may be due on the other contract or contracts, especially if at the time the statement is sent, or check is received, the amount due on the other contract has not been fixed or determined and is not known to either of the parties."

The court below charged further and left it to the jury to find whether, under all the facts and circumstances, Sanders intended the check to be in settlement not only of contract 1254, but the contract involved in this action. The check sent, $774.48, was the exact balance of account on contract 1254. Nothing was said about contract 423. In fact, this contract is now being contested on the ground there was no "coming together of two minds." How could Sanders intend that the $774.48 check was to pay a contract that it is contended he never made? This matter was left to the jury. We think the charge borne out by the decision of this Court.

In *Rosser v. Bynum,* 168 N. C., p. 340, it is said: "It is well recognized that when, in case of a disputed account between parties, a check is given and received clearly purporting to be in full, or when such a check is given and from the facts and circumstances it clearly appears that it is to be received in full of all indebtedness of a given character or all indebtedness to date, the courts will allow to such a payment the effect contended for. The position is very well stated in *Aydlett v. Brown,* 153 N. C., 334, as follows: 'That when a creditor receives and collects a check sent by his debtor on condition that it shall be in full for a disputed account, he may not thereafter repudiate the conditions annexed to the acceptance'; and is upheld and approved in numerous decision of the Court, *Armstrong v. Lonon,* 149 N. C., 435; *Kerr v.*

MORGAN *v.* BANK.

*Sanders,* 122 N. C., 635; *Pruden v. R. R.,* 121 N. C., 511; *Petit v. Woodlief,* 115 N. C., 125; *Koonce v. Russell,* 103 N. C., 179.  A proper consideration of these and other cases on the subject will disclose that such a settlement is referred to the principles of accord and satisfaction, and unless the language and the effect of it is clear and explicit it is usually a question of intent, to be determined by the jury."  *Supply Co. v. Watt,* 181 N. C., 432; *Blanchard v. Peanut Co.,* 182 N. C., p. 20; *DeLoache v. DeLoache,* 189 N. C., 394.

W. M. Sanders is dead and his executors have contested this matter. This was their bounden duty to do, to protect the estate.  If he had lived, no doubt this litigation could have been avoided.  The contract was made during, perhaps, the worst deflated period this country has known.  We must abide by the written words.

In *May v. Menzies,* 186 N. C., p. 149, it is said: "Merchants, in trading with each other, should know their rights and responsibilities.  Settled law often has the effect of making people certain and careful in their dealings.  Honesty in dealing with each other at home, with those of other States, and with the nations of the earth, is the golden cord to bind us together.  Good faith—keeping of contracts."

From a careful review of the entire case, we can find

No error.